UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

16-20349-CR-RNS/OTAZO-REYES

UNITED STATES OF AMERICA,       )
                                )
            PLAINTIFF,          )
                                )
      VS.                       )
                                )
JAMES GONZALO MEDINA,           )
                                )
            DEFENDANT.          )
_____)

(TRANSCRIPT BY DIGITAL RECORDING)

TRANSCRIPT OF PRETRIAL DETENTION HEARING HAD BEFORE
THE HONORABLE ANDREA M. SIMONTON, IN MIAMI, MIAMI-DADE COUNTY,
FLORIDA, ON MAY 10, 2016, IN THE ABOVE-STYLED MATTER.

APPEARANCES:

FOR THE GOVERNMENT:  MARC S. ANTON, A.U.S.A.
                     KAREN E. GILBERT, A.U.S.A.
                     99 NE 4TH STREET
                     MIAMI, FL 33132 - 305 961-9161

FOR THE DEFENDANT:   JOAQUIN PADILLA, A.F.P.D.
                     150 WEST FLAGLER STREET, SUITE 1700
                     MIAMI,  FL 33130 - 305 530-7000

CARL SCHANZLEH, RPR - CM
CERTIFIED COURT REPORTER
9960 SW 4TH STREET
PLANTATION, FLORIDA 33324
954 424-6723

TABLE OF CONTENTS

WITNESSES:                        DIRECT  CROSS REDIRECT RECROSS

DAVID CLANCY ............................ 11      22

INDEX TO EXHIBITS

| EXHIBITS | MARKED FOR IDENTIFICATION | | RECEIVED IN EVIDENCE | |
|---|---|---|---|---|
| DESCRIPTION | PAGE | LINE | PAGE | LINE |

(MIAMI, MIAMI-DADE COUNTY, FLORIDA; MAY 10, 2016, IN OPEN COURT.)

THE COURT: THE NEXT TWO CASES ARE DETENTION HEARINGS.

IF ONE OF THEM IS UNCONTESTED AND THE OTHER IS CONTESTED I'LL TAKE THE UNCONTESTED ONE FIRST. IF THEY ARE BOTH CONTESTED I'LL JUST TAKE THEM IN THE ORDER IN WHICH THEY ARE.

SO I JUST ASK THE GOVERNMENT TO TELL ME, IS MEDINA -- EXCUSE ME, JAMES GONZALO MEDINA CONTESTED OR UNCONTESTED?

MR. ANTON: CONTESTED, YOUR HONOR.

THE COURT: AND IS WILLIAM MUNOZ CONTESTED OR UNCONTESTED?

MR. ANTON: CONTESTED, YOUR HONOR.

THE COURT: OKAY. THEN WE'LL START WITH UNITED STATES VERSUS JAMES GONZALO MEDINA, CASE NUMBER 16-2562.

MR. ANTON: GOOD MORNING, YOUR HONOR. MARK ANTON AND KAREN GILBERT ON BEHALF OF THE UNITED STATES.

THE COURT: THANK YOU.

AND ON BEHALF OF THE DEFENDANT?

MR. PADILLA: GOOD MORNING, JUDGE. JOAQUIN PADILLA FROM THE FEDERAL DEFENDER'S OFFICE ON BEHALF OF MR. MEDINA WHO IS PRESENT IN COURT THIS MORNING.

THE COURT: THANK YOU.

MR. MEDINA, WOULD YOU STATE YOUR NAME AND AGE, PLEASE?

THE DEFENDANT: I'M JAMES MEDINA. I'M 40.

THE COURT:  OKAY.  THANK YOU, SIR.

LET ME JUST TAKE A MOMENT TO GET SET UP.

MR. PADILLA:  JUDGE, IF IT WOULD MAKE IT EASIER AND SPEED THINGS UP A BIT WITHOUT CAUSING A PROBLEM, I THINK WE COULD PROBABLY AGREE OR STIPULATE TO THE FACTS IN THE PROBABLE CAUSE AFFIDAVIT.

I THINK THE GOVERNMENT WOULD -- THE AGENT WILL STIPULATE THAT THOSE ARE THE FACTS AND JUST -- IT'S 14 PAGES LONG.  JUST TO --

THE COURT:  OKAY.  WHAT I'LL DO IS, I'LL HAVE -- THE GOVERNMENT CAN ADOPT BY REFERENCE THE AVERMENTS IN THE COMPLAINT.

BUT THEN WHAT I WOULD LIKE THE GOVERNMENT TO DO IS HIGHLIGHT JUST FOR ME BRIEFLY THE INVOLVEMENT OF THE DEFENDANT AND WHAT HE DID WITH RESPECT TO THIS OFFENSE.  JUST A BRIEF SYNOPSIS OF THE AVERMENTS IN THE COMPLAINT HIGHLIGHTING THE MOST IMPORTANT POINTS FOR ME.

AND I DON'T KNOW -- MR. ANTON, IS THAT GOING TO BE YOU OR IS THAT GOING TO BE MISS GILBERT?

MR. ANTON:  IT WILL BE ME, YOUR HONOR.

THE COURT:  OKAY.  THAT'S FINE.  AND IF YOU CAN BEGIN BY TELLING ME -- SO YOU DO NOT -- WE DO NOT HAVE TO HAVE AN AGENT TESTIFY IN THIS CASE, IS THAT CORRECT?

MR. PADILLA:  I WOULD LIKE TO ASK HIM SOME QUESTIONS BUT I THINK THAT THEY RELATE MORE TO DANGER AND THINGS LIKE

THAT, SOME FACTS THAT ARE NOT ACTUALLY IN THE COMPLAINT.

THE COURT: WELL, I'LL ALLOW BRIEF INQUIRY. BUT GENERALLY I RESTRICT THE EXAMINATION OF AN AGENT TO THE FACTS UPON WHICH THE GOVERNMENT RELIES TO SUPPORT DETENTION AND THEN YOU CAN PROFFER EVIDENCE ON BEHALF OF YOUR CLIENT.

AND, MR. ANTON, WILL YOU CALL AN AGENT TO COME FORWARD AND BE PREPARED TO BE ASKED QUESTIONS BY MR. PADILLA?

MR. ANTON: YES, JUDGE. WE HAVE FBI SPECIAL AGENT DAVID CLANCY HERE IN COURT TODAY.

THE COURT: OKAY. THANK YOU.

IF YOU COULD COME FORWARD.

THE CLERK: PLEASE RAISE YOUR RIGHT HAND.

(WITNESS SWORN)

THE WITNESS: I DO.

THE CLERK: THANK YOU.

PLEASE BE SEATED AND SPEAK INTO THE MICROPHONE. STATE YOUR NAME AND SPELL YOUR FIRST AND LAST NAME FOR THE RECORD.

THE WITNESS: MY NAME IS DAVID CLANCY. D-A-V-I-D LAST C-L-A-N-C-Y. I'M A SPECIAL AGENT WITH THE FEDERAL BUREAU OF INVESTIGATION.

THE COURT: OKAY. THANK YOU.

MR. ANTON, YOU CAN PROCEED. BEGIN BY TELLING ME WHETHER YOU'RE SEEKING DETENTION BASED ON RISK OF FLIGHT, DANGER TO THE COMMUNITY OR BOTH, WHAT THE ESTIMATED GUIDELINE RANGE IS, AND WHETHER THERE -- WHAT STATUTORY MAXIMUM IS AND

WHETHER THERE IS A STATUTORY PRESUMPTION.

MR. ANTON:  JUDGE, WE ARE SEEKING PRETRIAL DETENTION BASED UPON BOTH RISK OF FLIGHT AND DANGER TO THE COMMUNITY.

THE CHARGE IN THE INSTANT OFFENSE IS A VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 2332(A)(A)(2), THE ATTEMPTED USE OF A WEAPON OF MASS DESTRUCTION.

THE MAXIMUM PENALTY IS LIFE IN PRISON.  THE GUIDELINE RANGE IS 360 MONTHS TO LIFE IN PRISON.  AND, YES, A PRESUMPTION OF DETENTION DOES APPLY.

THIS PARTICULAR CRIME IS FOUND IN TITLE, 18, UNITED STATES CODE, SECTION 2332(G)(5)(B), AND AS SUCH IT IS DEFINED AS A FEDERAL CRIME OF TERRORISM.  AS CROSS-REFERENCED THE PRESUMPTION OF DETENTION APPLIES UNDER 18, UNITED STATES CODE, SECTION 3142(E)(3)(C).

THE COURT:  OKAY.  YOU CAN PROCEED.

MR. ANTON:  JUDGE, AS YOUR HONOR IS AWARE IN THE INSTANT CASE, THE AFFIANT FILED APPROXIMATELY A 16 PAGE COMPLAINT WHICH WAS SWORN TO AND APPROVED BY MAGISTRATE TURNOFF.  THE GOVERNMENT WOULD BE ADOPTING THOSE FACTS IN ITS ENTIRETY IN TERMS OF THE FACTS OF THE UNDERLYING MATTER.

BUT IN TERMS OF A BRIEF SUMMARY, FROM APPROXIMATELY MARCH OF 2016 TO THE PRESENT, THE FBI LAUNCHED AN INVESTIGATION OF AN INDIVIDUAL WHO WAS INTERESTED IN COORDINATING AND CONDUCTING AN ATTACK ON A SYNAGOGUE IN AVENTURA, FLORIDA.

THIS INDIVIDUAL, THE DEFENDANT JAMES MEDINA, OVER THE

COURSE OF APPROXIMATELY ONE MONTH DISCUSSED WITH AN FBI CONFIDENTIAL HUMAN SOURCE OBTAINING A BOMB WHICH HE COULD EITHER PLACE UNDER A CAR OR THROW OVER THE WALL OF THE SYNAGOGUE.

ON APRIL 29TH OF 2016, THE DEFENDANT TOOK POSSESSION AND ARMED WHAT HE BELIEVED TO BE AN EXPLOSIVE DEVICE.  THE DEFENDANT WAS ULTIMATELY ARRESTED AS HE WALKED TOWARDS THE TEMPLE BY THE FBI.

THE DEFENDANT LATER GAVE A FULL CONFESSION TO LAW ENFORCEMENT, BUT MORE DETAILS ARE OUTLINED SPECIFICALLY IN THE COMPLAINT AFFIDAVIT.

THE COURT:  OKAY.  AND I WILL HEAR ARGUMENT FROM YOU REGARDING DETENTION.

MR. ANTON:  YOUR HONOR, IN TERMS OF DETENTION.  IF WE LOOK TOWARD THE 3142(G) FACTORS AND WE FIRST TURN TO (G)(1), THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.

AS I MENTIONED PREVIOUSLY WE'VE GOT A FEDERAL CRIME OF TERRORISM WITH THE PRESUMPTION OF DETENTION APPLYING.  THIS IS THE ATTEMPTED USE OF A WEAPON OF MASS DESTRUCTION TO BLOW UP A SYNAGOGUE FULL OF JEWISH MEMBERS DURING PASSOVER SERVICES.

THE MAXIMUM PENALTY IS LIFE IN PRISON, THE GUIDELINES ARE 360, LIFE, AND THE PRESUMPTION APPLIES.

THIS IS A DEFENDANTS WHO WAS NOT CONCERNED WITH KILLING WOMEN AND CHILDREN.  THIS IS A DEFENDANT WHO WANTED TO TERRORIZE THE TEMPLE.  THIS IS A DEFENDANT WHO DISCUSSED REMOTE

DETONATION, WHO DISCUSSED PLACING A BOMB CLOSE TO DOORWAYS, WHO DISCUSSED PLACING A BOMB IN A BATHROOM, WHO CONDUCTED SURVEILLANCE ON MULTIPLE OCCASIONS AND STATED ON RECORDED CONVERSATIONS, I WANT TO SEE DAMAGE TO THEIR ASS. I WANT TO SEE SOMETHING, MAN. JUST GO IN THERE AND RAMPAGE EVERYBODY, IN REFERENCE -- IN REFERENCE TO AN ATTACK WITH A POSSIBLE AK 47 ASSAULT RIFLE.

THIS IS A DEFENDANT WHO WAS EXCITED STATING, OH MY GOD. I CAN'T WAIT. THAT SOUNDS AWESOME. LET'S MAKE IT HAPPEN. IT'S MY CALL OF DUTY. I'M DOING IT FOR A GOOD CAUSE FOR ALLAH. IT'S MY CALLING.

IT'S A DEFENDANT WHO STATED, AND I'M HOPING THAT ONE BOMB CAN CAUSE BIG DAMAGE AND LET THEM REALIZE THAT THEIR YOM KIPPUR IS GOING DOWN.

ON A DAY OF ATTACK THE DEFENDANT RECORDED THREE VIDEOS ON A CELLPHONE WHERE HE STATED, I AM A MUSLIM AND I DON'T LIKE WHAT'S GOING ON IN THIS WORLD. I'M GOING TO HANDLE BUSINESS HERE IN AMERICA. AVENTURA, WATCH YOUR BACK. TODAY IS GOING TO BE A DAY WHERE MUSLIMS ATTACK AMERICA. I'M GOING TO SET A BOMB IN AVENTURA, AND THEN HE SAID GOODBYE TO HIS FAMILY.

THEREAFTER THE DEFENDANT GAVE A FULL CONFESSION TO LAW ENFORCEMENT. HE STATED THAT HIS MOTIVATION WAS TO STRIKE BACK FOR ALL THE WARS, AND HIS GOAL WAS TO SEND A MESSAGE AND WAS INDIGNANT AS TO THE LOSS OF LIFE STATING, WHATEVER HAPPENS.

THIS IS A DEFENDANT WHO HAD MULTIPLE OPPORTUNITIES TO

BACK OUT OF THE OFFENSE AND BACK OUT OF THE PLOT BUT NEVER DID.

IF YOUR HONOR LOOKS AT THE WEIGHT OF THE EVIDENCE FACTOR UNDER 3142(G)(2), THE WEIGHT OF THE EVIDENCE IS EXTREMELY STRONG.  WE HAVE RECORDED CONVERSATIONS WITH THE CHS AND AN UNDERCOVER EMPLOYEE.  WE HAD VIDEO SURVEILLANCE OF THESE MEETINGS.  WE HAVE A FULL CONFESSION BY THE DEFENDANT.

WHEN THE DEFENDANT WAS ARRESTED AFTER HE HAD TAKEN POSSESSION OF THE DEVICE THAT HE THOUGHT WAS A BOMB HAD ARMED IT AND HAD TRAVELED TOWARDS THE TARGET LOCATION AND WAS ONLY STOPPED BY THE FBI AS HE WAS WALKING TOWARDS THE TEMPLE.  HE HAD PROVIDED A LAPTOP BAG TO CONCEAL THE DEVICE.  HE PROVIDED THE CELLPHONE TO DETONATE IT.

IF YOUR HONOR THEN TURNS TO THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT.

UNDER 3142(G)(3)(A), WE HAVE A DEFENDANT WHO HAS MULTIPLE PRIOR ARRESTS INCLUDING A CONVICTION FOR STRONG ARMED ROBBERY AND OTHER VIOLENCE RELATED CRIMES SUCH AS AN ASSAULT AND BATTERY, AGGRAVATED STALKING, AND A VIOLATION OF A DOMESTIC VIOLENCE INJUNCTION AMONG OTHERS.

WE HAVE A DEFENDANT WHO HAS AN ACTIVE RESTRAINING ORDER IN PLACE AGAINST HIM BY FATIMA KAHENA, A FORMER GIRLFRIEND WITH NO EXPIRATION DATE.  EVEN HIS OWN MOM HAD FILED A RESTRAINING ORDER AGAINST HIM.

THIS IS A DEFENDANT WHO HAS NO STABLE LEGAL RESIDENCE, NO STABLE JOB.  HE IS DIVORCED FROM HIS WIFE, HASN'T SEEN HIS

SON SINCE 2012.  AND, IN FACT, ACCORDING TO THE PRETRIAL SERVICES REPORT IS ESTRANGED FROM ALL OF HIS FAMILY MEMBERS.

HE HAS A HISTORY OF DRUG USE.  HE USES MARIJUANA DAILY, HE HAS A HISTORY OF MENTAL ILLNESS, AND HIS FATHER LIVES IN ECUADOR.

IF YOUR HONOR THEN TURNS TO 3142(G)(4), THE NATURE AND SERIOUSNESS OF THE DANGER TO ANY PERSON OR COMMUNITY POSED BY RELEASE.

THIS IS A VERY VIOLENT INDIVIDUAL WITH AN INTENSE HATRED TOWARDS THE JEWS AND WAS INTENT ON CAUSING MASS CASUALTIES AT THE TEMPLE.

YOUR HONOR, THIS IS A DEFENDANT WHO CANNOT BE RELEASED ON PRETRIAL RELEASE.  THIS IS A DEFENDANT WHO CANNOT BE RELEASED TO ANOTHER MEMBER OF THE COMMUNITY.  THIS DEFENDANT IS BOTH A DANGER TO THE COMMUNITY AND A RISK OF FLIGHT, AND CLEARLY THE GOVERNMENT HAS PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT UNDER 18, UNITED STATES CODE SECTION 3142(E) NO CONDITION OR COMBINATION OF CONDITIONS WILL REASONABLY ASSURE THE SAFETY OF THE COMMUNITY, AND BY A PREPONDERANCE OF THE EVIDENCE THE DEFENDANT IS A FLIGHT RISK AND THE DEFENDANT SHOULD BE HELD IN PRETRIAL DETENTION.

THE COURT:  OKAY.  THANK YOU.

MR. PADILLA, DO YOU HAVE ANY QUESTIONS THAT YOU WISH TO ASK THE AGENT?

MR. PADILLA:  I DO, JUDGE.

THE COURT:  OKAY.  BRIEFLY.

MR. PADILLA:  THANK YOU, JUDGE.

DAVID CLANCY,

BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

CROSS EXAMINATION

BY MR. PADILLA:

Q.  AGENT, I KNOW THAT YOU HEARD JUST WHAT THE GOVERNMENT SAID.

ISN'T IT -- I'M NOT DISPUTING THE FACTS THAT ARE CONTAINED HERE.  BUT ISN'T THE TRUTH THAT WE ARE DEALING WITH A MAN WHO HAS MENTAL HEALTH ISSUES AND HAS HAD THEM FOR A LONG TIME, WHO AT THE TIME OF THIS OFFENSE WAS HOMELESS?

ISN'T THAT THE PERSON THAT WE'RE DEALING WITH?

A.  I CAN'T SPEAK TO HIS MENTAL HEALTH AND ANY DIAGNOSES THAT A MEDICAL DOCTOR HAS GIVEN HIM.

Q.  ALL RIGHT.  WELL, SINCE THIS INVESTIGATION BEGAN, HAVE YOU LEARNED ABOUT MR. MEDINA'S MENTAL HEALTH ISSUES?

A.  AGAIN --

Q.  I'M NOT ASKING YOU FOR A DIAGNOSE.  I'M JUST SAYING, DID YOU BECOME AWARE AT SOME POINT THAT HE HAS MENTAL HEALTH ISSUES?

A.  YES, SIR.

Q.  OKAY.  WHEN WAS THAT?

A.  DURING THE COURSE OF THE INVESTIGATION WE WERE AWARE OF A BAKER ACT THAT HAD BEEN FILED WHEN MR. MEDINA WAS HOSPITALIZED USING A BAKER ACT.

Q.  ALL RIGHT.  ISN'T IT TRUE THAT THERE HAD BEEN AT LEAST TWO ATTEMPTS BY THE FAMILY -- BY MR. MEDINA'S FAMILY TO HAVE HIM INVOLUNTARILY COMMITTED TO A MENTAL HEALTH INSTITUTION?

A.  I CAN'T SPEAK TO WHAT THE FAMILY HAS DONE AS FAR AS --

THE COURT:  YOU CAN PROFFER FACTS ABOUT HIS MENTAL HEALTH OR HIS STATUS, AND IF THE GOVERNMENT CONTRADICTS IT THEN YOU -- BUT I THINK IT'S PROBABLY MORE EFFICIENT IF YOU HAVE -- IF YOU HAVE FACTS THAT YOU WANT TO PROFFER ABOUT HIS MENTAL CONDITION AND THOSE KINDS OF THINGS, IT'S PROBABLY MORE EFFECTIVE UNLESS YOU'RE TRYING TO EXPLORE THINGS YOU DON'T KNOW ABOUT.  BUT THE AGENT IS REALLY HERE TO DISCUSS THE FACTS OF THE INVESTIGATION AS HE HAS THEM --

MR. PADILLA:  OKAY.

THE COURT:  -- OR TO TESTIFY REGARDING THAT.

MR. PADILLA:  UNDERSTOOD, JUDGE.

BY MR. PADILLA:

Q.  ONE OF THE THINGS -- WHEN YOU READ THE PROBABLE CAUSE AFFIDAVIT, ONE OF THE THINGS THAT YOU MENTION INITIALLY, AND YOU WROTE THIS, ONE OF THE THINGS THAT YOU MENTION IS MR. MEDINA IS MEETING WITH HIS ASSOCIATES, CORRECT?

A.  YES, SIR.

Q.  NOW, WHEN YOU SAY THE WORD ASSOCIATES YOU'RE TALKING ABOUT HIS FRIENDS, RIGHT?

A.  I WOULD CONSIDER THEM FRIENDS OF MR. MEDINA.

Q.  THESE ARE NOT BUSINESS PEOPLE, THESE ARE NOT PEOPLE IN SOME

SORT OF PROFESSIONAL ORGANIZATION, CORRECT?

A.  YES, SIR.

Q.  OKAY.  IN THE COURSE OF INVESTIGATING THIS, DID YOU LEARN WHETHER ANY OF MR. MEDINA'S FRIENDS WERE SOMEHOW INVOLVED IN ANY TERRORIST ORGANIZATIONS OR HAD BEEN RADICALIZED EITHER OUTSIDE THE COUNTRY OR IN THIS COUNTRY.

MR. ANTON:  I'M GOING TO OBJECT TO RELEVANCE.

MR. PADILLA:  IT GOES TO DANGER, JUDGE.

THE COURT:  WHAT HIS FRIENDS HAVE DONE IT GOES TO HIS DANGER?

MR. PADILLA:  YES.  BECAUSE THE INVESTIGATION INITIALLY CENTERED AROUND MR. MEDINA AND HIS FRIENDS, A GROUP OF THEM TALKING TO THE CONFIDENTIAL HUMAN SOURCE IN THIS CASE. SO I THINK IT BECOMES RELEVANT.

THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION AS THE WORDED.

YOU CAN ASK IF THE AGENT IS AWARE OF MR. MEDINA BEING INVOLVED WITH ANY TERRORIST ORGANIZATION.

MR. PADILLA:  OKAY.

BY MR. PADILLA:

Q.  SO LET'S STICK TO MR. MEDINA THEN.

DURING THE COURSE OF YOUR INVESTIGATION DID YOU LEARN THAT MR. MEDINA HAD BEEN RADICALIZED AGAIN EITHER OUTSIDE THE COUNTRY OR SOMEHOW INSIDE THIS COUNTRY?

A.  AGAIN I WOULD THINK THAT WOULD GO TO YOUR DEFINITION OF

RADICALIZATION. BY MR. MEDINA'S ONE ACCOUNTS HE WAS CONDUCTING ATTACK WHERE HE WAS ATTEMPTING TO BOMB A JEWISH SYNAGOGUE AND GIVE CREDIT TO ISIS FOR THE ATTACK.

SO, IN MY OPINION, YES, SIR, THAT WOULD INDICATE RADICALIZATION.

Q. OKAY. BUT LET'S -- LET ME ASK YOU A COUPLE OF QUESTIONS BASED ON YOUR RESPONSE.

ISN'T IT TRUE THAT THE CONFIDENTIAL HUMAN SOURCE IS THE VERY FIRST PERSON WHO MENTIONED A BOMB IN THIS CASE?

A. THE KIND OF ATTACK THAT WAS DISCUSSED, THERE WERE VARIOUS IDEAS THAT WERE THROWN OUT THERE. MR. MEDINA'S ORIGINAL IDEA WAS TO USE AK 47'S.

Q. OKAY. SO HE MENTIONED BOMBING IN YOUR ANSWER TO ME, BUT THE REALITY IS THE FIRST PERSON TO MENTION A BOMB IS YOUR SOURCE.

A. I'M TRYING TO RECALL EXACTLY THE WAY THE CONVERSATION WAS. BUT I WOULD SAY THAT WE INSTRUCTED THE SOURCE TO PROVIDE MR. MEDINA WITH THE IDEA THAT HE HAS A CONTACT THAT CAN GET VARIOUS THINGS TO INCLUDE AN EXPLOSIVE DEVICE.

Q. ON PAGE SIX OF THE COMPLAINT. DO YOU HAVE IT THERE?

A. YES, SIR.

Q. PARAGRAPH 12, WHAT YOU WROTE.

THE CONVERSATION THEN TURNED TOWARD THE DETAILS OF THE ATTACK. AND THE CONFIDENTIAL HUMAN SOURCE ADDRESSED THE CONCERNS OF ENTERING THE SYNAGOGUE WITH FIREARMS AND THEN

GETTING SHOT. AND INSTEAD THE SOURCE PROPOSED LEAVING AN UNSPECIFIED OBJECT BEHIND AND LEAVING THE SCENE.

A. CORRECT.

Q. AND LATER ON AT THE END OF THAT PARAGRAPH, THE SOURCE THEN DESCRIBED HOW A CELLULAR PHONE COULD SERVE TO DETONATE THE BOMB.

A. YES.

Q. ALL RIGHT. SO THAT'S THE SOURCE INTRODUCING THE IDEA OF A BOMB, CORRECT?

A. IN THAT REGARD, YES, SIR.

Q. OKAY. YOU ALSO MENTIONED THAT MR. MEDINA MENTIONED ISIS, CORRECT, AS SOMEHOW PROOF OF HIS RADICALIZATION, CORRECT?

A. YES, SIR.

Q. PARAGRAPH EIGHT OF YOUR -- ISN'T IT TRUE THAT AGAIN THE SOURCE IS THE FIRST PERSON TO MENTION ISIS IN THIS CASE?

A. YES. THE SOURCE INTRODUCED THE IDEA OF WHICH GROUP SHOULD RECEIVE CREDIT FOR IT --

Q. OKAY.

A. -- AND HE PROVIDED SOME OPTIONS.

Q. SO AGAIN, GETTING BACK TO YOUR ANSWER.

YOUR ANSWER TO ME ABOUT WHETHER MR. MEDINA HAD SOMEHOW BEEN RADICALIZED EITHER OUTSIDE THE COUNTRY OR INSIDE THE COUNTRY YOU MENTION TWO THINGS, THE BOMB AND ISIS, CORRECT?

A. YES, SIR.

Q. ALL RIGHT. AND NOW, BOTH OF THOSE THINGS, THE BOMB AND THE

REFERENCE TO ISIS, WERE GENERATED OR CAME FROM YOUR SOURCE, CORRECT?

A.  AGAIN, THE IDEA -- THE OPPORTUNITY TO USE A REMOTE DETONATED DEVICE AND THE POTENTIAL FOR WHICH GROUP SHOULD RECEIVE CREDIT IN BOTH CASES AS OUTLINED IN THE INDICTMENT, YES, SIR.

Q.  OKAY.  SO AGAIN, GETTING BACK TO MR. MEDINA'S RADICALIZATION.

BESIDES THAT, DO YOU HAVE ANY EVIDENCE, ANYTHING ANYWHERE THAT YOU HAVE GENERATED IN THE LAST TWO MONTHS, ANY SOCIAL MEDIA SITES, ANY PUBLICATIONS, ANYTHING THAT MR. MEDINA HAD ACCESS TO, TO ESTABLISH THAT HE WAS SOMEHOW RADICALIZED?

A.  YES, SIR.  TO HAVE AN INDIVIDUAL KNOWING THE -- TAKE WHAT HE BELIEVED TO BE AN EXPLOSIVE DEVICE AND WALK TOWARDS A SYNAGOGUE FULL OF PEOPLE, THAT TO ME IS CLEARLY A RADICALIZED INDIVIDUAL.

Q.  OKAY.  YOU'RE -- I'M ASSUMING THAT YOU'RE TAKING THOSE FACTS WITHOUT REGARD TO THE PERSON BEFORE THE COURT, IS THAT FAIR TO SAY?  WITHOUT ANY THOUGHT TO MR. MEDINA'S MENTAL HEALTH OR STATE OF MIND?

A.  AGAIN, SIR, I CAN'T SPEAK TO MR. MEDINA'S MENTAL HEALTH.

Q.  WOULD YOU AGREE THAT IT WOULD AFFECT -- THAT A PERSON WHO HAS MENTAL HEALTH PROBLEMS, LONGSTANDING MENTAL HEALTH PROBLEMS -- I KNOW THAT YOU SPOKE TO MR. MEDINA'S SISTER ABOUT THESE ISSUES, WOULDN'T YOU AGREE THAT THAT WOULD AFFECT A

PERSON'S ABILITY TO UNDERSTAND AT LEAST THE SERIOUSNESS AND THE CONSEQUENCES OF WHAT THEY'RE DOING?

A.   YES, SIR.   I THINK MENTAL HEALTH COULD IMPACT A PERSON'S DECISIONS.

Q.   DO YOU HAVE ANY EVIDENCE -- LET ME GO BACK ONE SECOND.

YOU MENTIONED -- OR THE GOVERNMENT MENTIONED, I SHOULD SAY, THAT MR. MEDINA WAS SOMEHOW INTERESTED IN BOMBING A SYNAGOGUE OR PLANNING SOME SORT OF ATTACK.   I THINK THE GOVERNMENT MENTIONED THAT.

I DON'T THINK IT'S THAT -- THAT PHRASING IS SPECIFICALLY IN THE COMPLAINT.   BUT IS THAT FAIR TO SAY, THAT SOMEHOW YOU LEARNED THAT HE WAS INTERESTED IN DOING THIS?

A.   YES, SIR.

Q.   OKAY.   BESIDES TALKING ABOUT THAT WITH HIS TWO FRIENDS AND THE SOURCE IN THIS CASE, DO YOU HAVE ANY EVIDENCE THAT MR. MEDINA TALKED TO ANYONE ELSE ABOUT HIS INTEREST IN PLANNING ANY SORT OF ATTACK?

A.   THE ONLY CONVERSATIONS THAT I HAVE KNOWLEDGE OF, OF MR. MEDINA DISCUSSING THE ATTACK ARE OUTLINED HERE OR IN RECORDED CONVERSATIONS.

Q.   OKAY.   SO BESIDES THAT GROUP THAT WE KNOW ABOUT HERE IN THE COMPLAINT NO ONE ELSE.

A.   NO, SIR, I'M NOT AWARE OF ANYONE ELSE.

Q.   DO YOU HAVE ANY INFORMATION REGARDING MR. MEDINA'S CONVERSION TO THE MUSLIM FAITH OR GETTING INVOLVED IN PLANNING

THIS ATTACK?

A. YES. MR. MEDINA OUTLINED TO US IN HIS POST ARREST INTERVIEW BASIC ELEMENTS OF HIS CONVERSION AND WHY HE CONVERTED.

Q. AND WHAT DID HE TELL YOU?

A. HIS CONVERSION HAPPENED APPROXIMATELY FOUR YEARS AGO -- FOUR TO FIVE YEARS AGO SHORTLY AFTER THE TIME HE WAS DIVORCED AND SEPARATED FROM HIS SON.

Q. WHEN HE SPOKE TO YOU ABOUT HIS CONVERSION DID HE MENTION TO YOU ANY SPECIFICS REGARDING THE PHILOSOPHY OR THE PRINCIPLES REGARDING HIS CONVERSION?

A. HE CONVERTED THAT HE -- HE STATED THAT HE CONVERTED TO ISLAM, AND HE EXPLAINED TO US WHERE HE ATTENDED MOSQUE.

Q. DID HE TELL YOU THAT HE CONVERTED TO ISLAM BECAUSE OF A DIVORCE THAT HE -- THAT HE HAD JUST GONE THROUGH?

A. YES, SIR. I THINK THAT WAS ONE OF THE THINGS THAT CAUSED HIM TO SEARCH FOR AN -- HYPOTHESIZING ANSWERS IN RELIGION.

Q. OKAY. BESIDES TELLING YOU THAT HE CONVERTED BECAUSE OF SOME BAD DIVORCE THAT HE WAS GOING THROUGH, DID HE GIVE YOU ANY SPECIFICS AGAIN ABOUT CONVERTING TO ISLAM BECAUSE OF SOME DEEP SEEDED FAITH BASED REASON AS FOR HIS CONVERSION AS OPPOSED TO BEING UPSET ABOUT HIS DIVORCE?

A. HE WAS UPSET ABOUT HIS DIVORCE. ANOTHER REASON THAT HE STATED WAS UPSET ABOUT THE WAY HE HAD BEEN TREATED BY HIS FAMILY WHO WERE ALL CHRISTIANS.

Q.  ALL RIGHT.  SO FROM WHAT I'M HEARING FROM YOU, KNOWING DETAILS ABOUT SPECIFIC PRINCIPLES OF ISLAM OR THE FACT THAT HE WANTED TO FOLLOW THE TEACHINGS OF ISLAM, OR ANYTHING LIKE THAT, ANY DETAILS, ANY SPECIFICS?  CAN YOU POINT TO ANYTHING?

A.  I'M TRYING TO ANSWER YOUR QUESTION AS BEST AS POSSIBLE.

THE SPECIFICS WITHIN THE FAITH THAT DREW HIM TO THE FAITH?

Q.  YES.

A.  HE DIDN'T TALK ABOUT SPECIFIC SCHOLARS THAT ATTRACTED HIM. HE TALKED ABOUT READING THE KORAN AND FINDING ANSWERS TO QUESTIONS THAT HE HAD ABOUT HIS FAITH IN THE KORAN.

HE QUESTIONED THE WAY THE BIBLE WAS WRITTEN AND FELT THAT IT WAS NOW MISREPRESENTED, AND THAT THE -- THERE ARE THINGS WITHIN THE BIBLE THAT ARE NOT TRUE THAT HE FELT WERE CHANGED AT A LATER DATE.

SO ALL OF THESE THINGS, YOU KNOW, PUSHED HIM TO FEEL THAT THE KORAN WAS THE TRUE TEXT AND HE WAS IN FACT FOLLOWING THE TRUE TEXT NOW.

Q.  IN THE COURSE OF YOUR INVESTIGATION DID YOU DISCOVER IF MR. MEDINA HAD BEEN ATTENDING ANY MOSQUES HERE IN THE SOUTH FLORIDA REGION?

A.  YES, SIR.

Q.  AND HAVE YOU HAD AN OPPORTUNITY TO SPEAK TO ANYBODY AT ANY OF THOSE MOSQUES ABOUT MR. MEDINA?

A.  WE HAVEN'T GONE DIRECTLY TO SPEAK WITH SOMEONE THERE.

Q.  NO, YOU HAVEN'T TALKED TO ANYONE AT ANY MOSQUE REGARDING MR. MEDINA.

A.  NOT AT THIS POINT, SIR, NO.

Q.  ONE OF THE THINGS THAT WAS MENTIONED VERY EARLY ON IN THE COMPLAINT, AND IT WAS DISCUSSED AMONG THE PEOPLE HERE WAS THIS INITIAL PLAN THAT INVOLVED AK 47'S.

A.  YES, SIR.

Q.  IN THE COURSE OF YOUR INVESTIGATION WERE YOU ABLE TO DETERMINE WHETHER THAT WAS TRUE OR WHETHER THERE WAS EVEN FEASIBLE THAT THERE WERE ACTUALLY AK 47'S OUT THERE, DID SOMEONE HAVE THOSE?  WAS ANY OF THAT TRUE?

A.  YES, SIR.

Q.  AND WAS IT TRUE OR NOT TRUE?

A.  YES, SIR, THERE WERE AK 47'S.

Q.  NOT IN THE POSSESSION OF MR. MEDINA?

A.  AT THE TIME OF THE START OF THE INVESTIGATION MR. MEDINA WAS LIVING WITH TWO OTHER INDIVIDUALS REFERENCED IN THE COMPLAINT, AND ONE OF THOSE INDIVIDUALS DID IN FACT POSSESS AN AK 47 ALONG WITH OTHER WEAPONS.

Q.  AND AS FAR AS YOU KNOW WHEN DID MR. MEDINA LIVE AT THAT RESIDENCE?

A.  AT THE TIME OF THIS INITIAL CONVERSATION, MARCH 27TH WHEN WE INITIATED THE INVESTIGATION.

Q.  DURING THE COURSE OF THE INVESTIGATION DID YOU LEARN THAT MR. MEDINA HAD LIVED ANYWHERE ELSE?

A.   YES.  SUBSEQUENT TO THAT, YES, SIR.

Q.   AND WHERE WAS THAT?

A.   IN HOLLYWOOD.  THERE WAS A BUILDING THAT MR. MEDINA WAS RESIDING IN NOT OFFICIALLY -- I THINK I WOULD USE THE TERM HE WAS SQUATTING IN.

Q.   IT WAS AN ABANDONED BUILDING, RIGHT?

A.   YES, SIR.

Q.   OKAY.  AND, AS FAR AS YOU KNOW, DID MR. MEDINA HAVE ANY SORT OF SKILL OR TRAINING WHATSOEVER TO BE ABLE TO DEVELOP, BUILD SOME SORT OF BOMB THAT WAS GOING TO BE SOMEHOW DETONATED BY TELEPHONE?

A.   I'M NOT AWARE OF ANY TECHNICAL EXPERTISE HE HAS IN THAT AREA, SIR.

Q.   AND, AS FAR AS THE INVESTIGATION WENT, MR. MEDINA DID NOT PROVIDE ANY WEAPONS, TECHNICAL EXPERTISE, DIDN'T REALLY BRING ANYTHING TO THE TABLE BESIDES BEING THE PERSON WHO WAS GOING TO DROP THIS PACKAGE OFF.

A.   HE DIDN'T PROVIDE TECHNICAL EXPERTISE.  HE PROVIDED A BAG THAT WOULD BE USED TO HOUSE THE BOMB, AND ALSO A PHONE TO BE USED AS A DETONATOR FOR IT.

Q.   BUT HE CERTAINLY DIDN'T HAVE THE ABILITY TO --

A.   NOT THAT I'M AWARE OF.

Q.   -- SO FAR YOU KNOW TO BUILD OR PULL THAT OFF.

A.   NO.  NOT TO CONSTRUCT IT.

Q.   AND THOSE WERE FACTS, THE BOMB AND THE TELEPHONE AND HAVING

SOME SORT OF REMOTE DETONATION, THOSE WERE FACTS ALL PROVIDED BY THE SOURCE IN THE CASE, CORRECT?

A.   THE IDEA HE COULD OBTAIN A REMOTE DETONATED EXPLOSIVE DEVICE.

MR. PADILLA:  THAT'S ALL I HAVE, JUDGE.

THE COURT:  OKAY.  MR. ANTON, DO YOU HAVE ANYTHING FURTHER YOU WISH TO ADD BY WAY OF FACTUAL PROFFER AND THEN I WILL LET MR. PADILLA MAKE HIS ARGUMENT?

MR. ANTON:  JUST VERY BRIEF REDIRECT, YOUR HONOR.

THE COURT:  OKAY.

REDIRECT EXAMINATION

BY MR. ANTON:

Q.   AGENT CLANCY, REGARDLESS OF THE TYPE OF ATTACK, WHETHER IT FIRST BE WITH AN AK 47 ASSAULT RIFLE TO (INAUDIBLE) OR THEN LATER WITH A BOMB TO BLOW THEM UP, WHO FIRST POINTED OUT THE IDEA OR DISCUSS THE IDEA OF ATTACKING A SYNAGOGUE?

A.   MR. MEDINA AND HIS ASSOCIATES.

Q.   WHO FIRST TOLD THE SOURCE IN THIS CASE WHICH SYNAGOGUE WAS THE INTENDED TARGET?

A.   MR. MEDINA.

Q.   WHO TOLD THE SOURCE WHERE THAT PARTICULAR SYNAGOGUE WAS LOCATED?

A.   MR. MEDINA.

Q.   AND THIS WAS PRIOR TO THE SOURCE ESSENTIALLY GETTING INVOLVED IN THE CASE WHATSOEVER?

A. YES, SIR.

Q. YOU MENTIONED RADICALIZATION BRIEFLY.

WAS THERE A TIME BACK IN EARLY APRIL WHERE THERE WAS A RECORDED CONVERSATION WHERE THE DEFENDANT DISCUSSED HIS HATRED TOWARDS THE JEWS?

A. YES, SIR.

Q. AND DID HE EXPLAIN ON THIS RECORDED CONVERSATION WHY HE HELD THOSE BELIEFS AND CAN YOU EXPLAIN THEM TO THE COURT?

A. YES, SIR. MR. MEDINA BELIEVES THAT THE JEWS ARE THE CAUSE OF THE PRESENT STATE OF THE WORLD AND THE WARS THAT ARE TAKING PLACE IN THE MIDDLE EAST, THAT THEY ARE RESPONSIBLE FOR KILLING WHAT HE WOULD CONSIDER THE PROPHET JESUS AND OTHER PROPHETS.

Q. AND THOSE WERE HIS THOUGHTS.

A. YES, SIR.

Q. THAT HE RELAYED TO THE SOURCE IN DESCRIBING WHY HE HAD CHOSEN TO ATTACKS THE TEMPLE IN AVENTURA.

A. YES, SIR.

Q. AND FINALLY, AGENT, DO YOU NEED ANY SPECIAL TECHNICAL EXPERTISE TO PUSH A BUTTON?

A. NO, SIR.

Q. TO DIAL A PHONE NUMBER THAT WOULD REMOTELY DETONATE A BOMB?

A. NO, SIR.

MR. ANTON: NOTHING FURTHER.

THANK YOU, JUDGE.

THE COURT: OKAY. I WILL HEAR ARGUMENT.

MR. PADILLA, I WOULD LIKE YOU TO BEGIN BY TELLING ME WHETHER THERE ARE ANY ADDITIONS OR CORRECTIONS TO THE PRETRIAL SERVICES REPORT BECAUSE I WILL RELY ON IT UNLESS YOU TELL ME IT'S INACCURATE.

MR. PADILLA: JUDGE, I THINK THAT THERE ARE. I THINK THAT THERE WAS A LITTLE BIT OF CONFUSION ON PAGE TWO I THINK REGARDING SOME OF THE FAMILY HISTORY.

I THINK IT'S -- I BELIEVE IT'S MENTIONS THAT HIS DAUGHTER AT SOME POINT, AS SADE GARRARA, THAT'S IN PARAGRAPH TWO, I BELIEVE THAT THAT'S ACTUALLY HIS SISTER. I THINK IT'S ACTUALLY --

THE COURT: OKAY. LET ME --

MR. PADILLA: -- CORRECTED LATER ON.

THE COURT: OKAY. IT SAYS THAT --

MR. PADILLA: THE FOURTH LINE DOWN.

THE COURT: YES. THAT WOULD BE EXTREMELY UNUSUAL --

MR. PADILLA: YES.

THE COURT: -- HAVING A 38 YEAR OLD DAUGHTER.

MR. PADILLA: YES. THAT WOULD BE.

THE COURT: OKAY. THAT THAT'S HIS --

MR. PADILLA: THAT'S HIS SISTER?

THE COURT: -- SISTER.

MR. PADILLA: WHO IS HERE TODAY. SHE IS OUTSIDE BUT SHE'S HERE.

THE COURT: OKAY.

MR. PADILLA:  I BELIEVE THE -- I BELIEVE THAT THAT'S IT.

THE COURT:  OKAY.  I WILL HEAR ARGUMENT, MR. PADILLA.

MR. PADILLA:  JUDGE, I HAVE TOLD MR. MEDINA THAT HE'S NOT GETTING A BOND THIS MORNING, AND HE UNDERSTAND THAT HE'S NOT GETTING A BOND THIS MORNING.

ONE OF THE REASONS THAT I TOLD MR. MEDINA ABOUT THAT -- AND I SAY ONE OF THE REASONS BECAUSE THERE ARE MORE THAN ONE.  BUT I THINK IT DOESN'T TAKE A WHOLE LOT OF TIME IN SPEAKING TO MR. MEDINA TO UNDERSTAND THAT HE HAS MENTAL HEALTH ISSUES AND HE HAS HAD MENTAL HEALTH ISSUES FOR A LONG TIME.

I THINK THAT YOU TALK TO ANYBODY CLOSE TO MR. MEDINA AND THEY WILL ALL TELL YOU HE HAS MENTAL HEALTH ISSUES.  THEY HAVE BEEN UNTREATED FOR A LONG, LONG TIME.  HE HAS BEEN EMPLOYED FOR A PERIOD OF TIME.  HE DOES NOT HAVE HEALTH INSURANCE.

THE AGENT I KNOW REFERENCED A BAKER ACT OR AT LEAST TWO BAKER ACTS.  THERE WAS AT LEAST ONE FINDING I THINK BY A LOCAL JUDGE, I DON'T HAVE THE PAPERWORK, REGARDING MR. MEDINA'S MENTAL HEALTH HISTORY.

SO THIS IS INFORMATION THAT IS APPARENT ON HAVING A CONVERSATION WITH MR. MEDINA.  AND EVEN IF YOU DIDN'T GO BASED ON THAT, THERE IS PLENTY INFORMATION THAT -- AND THE AGENT MENTIONED THAT THEY DISCOVERED SOME OF IT THAT THERE ARE ISSUES REGARDING MR. MEDINA'S MENTAL HEALTH.

AND AGAIN, EVEN TAKING ONE STEP FURTHER AND ASKING PEOPLE WHO KNOW MR. MEDINA THEY WOULD ALL TELL YOU THAT THIS IS NOT RECENT, THAT THIS HAPPENED A LONG TIME AGO. HE MENTIONS HIS DIVORCE. BUT TO BE HONEST IF YOU TALK TO THE FAMILY THIS BEHAVIOR AND INSTABILITY DATES BACK TO PROBABLY EVEN CHILDHOOD.

I THINK THAT A LOT OF THE FAMILY MEMBERS CHALKED A LOT OF THAT STUFF UP TO JUST BEING A KID, AND I THINK IT WAS ONLY LATER THAT THEY LEARNED THAT HE HAS HAD SOME PROBLEMS FOR A VERY LONG TIME.

SO, YOU KNOW, IN A DIFFERENT SITUATION -- IN A DIFFERENT PLACE I THINK THAT AN APPROPRIATE PLACE FOR MR. MEDINA TO BE WOULD BE IN A FACILITY THAT COULD TREAT -- DIAGNOSE AND TREAT MR. MEDINA'S MENTAL HEALTH ISSUES. I DON'T THINK HE NEEDS TO BE AT FDC. I THINK HE NEEDS TO BE TREATED. HE HAS GONE UNTREATED FOR A VERY, VERY LONG TIME. AND AGAIN IN A DIFFERENT SITUATION I THINK THAT THAT WOULD BE MY PROPOSAL IN THIS CASE.

I'M NOT MINIMIZING THE CONDUCT HERE. WE UNDERSTAND THAT AT THE END OF THE DAY THAT MR. MEDINA IS ARRESTED AT OR NEAR THE SYNAGOGUE WHERE HE BELIEVE HE'S IN POSSESSION OF WHAT HE BELIEVES TO BE A BOMB. BUT AGAIN I THINK IF YOU GO BACK AND YOU LOOK AT THE FACTS OF THIS CASE, TO THE LENGTHS OF MR. MEDINA'S MENTAL HEALTH I THINK IT PAINTS A DIFFERENT PICTURE OF WHO THIS PERSON IS.

THIS IS NOT A HOME GROWN TERRORIST. THIS IS NOT

SOMEONE WHO HAS LEFT THE COUNTRY AND BEEN RADICALIZED AND COME BACK INTO THE COUNTRY AS A FULL BLOWN TERRORIST.

MY PERSONAL FEELING IS AT THAT POINT THE AGENTS COULD HAVE GOTTEN MR. MEDINA TO DO ANYTHING.  IT JUST SO HAPPENED THAT THEY GOT HIM TO DO A BOMB AT A SYNAGOGUE IN THIS CASE.  I THINK THAT THAT'S HOW SUSCEPTIBLE HE WAS BASED ON HIS MENTAL HEALTH HISTORY.

SO, I'M NOT GOING TO MAKE A BIG PUSH TO HAVE MR. MEDINA RELEASED.  HE HAS NOWHERE TO GO.  HIS FAMILY IS NOT IN A POSITION TO TAKE HIM.  SO I WILL LEAVE ANY OTHER ARGUMENTS I HAVE TO THE FACTS CONTAINED IN THE PRETRIAL SERVICES REPORT.

THE COURT:  DO YOU HAVE ANY RESPONSE, MR. ANTON?

MR. ANTON:  JUDGE, JUST BASICALLY THAT THIS DEFENDANT'S INSTABILITY OR MENTAL HEALTH REALLY DOES NOT NEGATE HIS DANGEROUSNESS TO THE COMMUNITY.

THIS IS NOT AN INDIVIDUAL WHO COULD BE RELEASED INTO EVEN A MENTAL HEALTH FACILITY.  WE THINK THAT THE MOST SECURE LOCATION FOR THE DEFENDANT PRETRIAL WOULD BE IN PRETRIAL DETENTION.  HE COULD RECEIVE WHATEVER SERVICES HE NEEDS IN CUSTODY, BUT HE SIMPLY AT THIS POINT CANNOT BE RELEASED INTO THE COMMUNITY.

THE COURT:  OKAY.  THANK YOU.

I AM GOING TO HOLD HIM IN DETENTION BASED ON RISK OF FLIGHT AND DANGER TO THE COMMUNITY.

HE HASN'T REBUTTED THE STATUTORY PRESUMPTION.  BUT

EVEN IF THERE WAS NO STATUTORY PRESUMPTION UNDER THE CIRCUMSTANCES OF THIS CASE I WOULD FIND THAT THE GOVERNMENT HAS CERTAINLY PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT HE IS A RISK OF NONAPPEARANCE.

HE IS UNEMPLOYED. HE DOESN'T HAVE ANY PLACE TO GO. HIS FAMILY WON'T TAKE HIM IN. HE IS FACING AN INCREDIBLY LENGTHY SENTENCE IF HE IS CONVICTED, AND HE HAS EVERY REASON TO DISAPPEAR INTO THE COMMUNITY AND NOT APPEAR AS REQUIRED.

IN ADDITION, I FIND THE GOVERNMENT HAS ESTABLISHED BY CLEAR AND CONVINCING EVIDENCE THAT HE IS A DANGER TO THE COMMUNITY.

ALTHOUGH HE MAY NOT HAVE BEEN THE PERSON WHO SUGGESTED THE USE OF A BOMB, I THINK THAT IT WAS IN MY JUDGMENT PROBABLY A VERY WISE DECISION FOR THE FBI TO SWITCH FROM THE USE OF AN AK 47 THAT HE APPARENTLY DID HAVE SOME ACCESS TO AND WHICH WOULD BE EXTREMELY HARD TO PREVENT HIM FROM USING TO THE IDEA OF A BOMB THAT WOULD WE BE EASILY CONTROLLED BECAUSE IT COULD BE -- IT COULD BE SIMULATED BY A DEVICE THAT COULD NOT CAUSE HARM.

SO, IN MY JUDGMENT THAT WAS PROBABLY A VERY WISE INVESTIGATIVE MOVE. I DON'T KNOW IF KNOW IF THAT WAS THEIR MOTIVE OR NOT, BUT I CERTAINLY -- IN TERMS OF THE AGENTS, BUT IT'S -- BUT THE DANGER THAT IS CREATED BY THE USE OF AN AK 47 TO GO INTO A SYNAGOGUE AND SPRAY IT WITH BULLETS TRYING TO KILL EVERYONE INSIDE IS CERTAINLY A HORRIFIC THOUGHT, AND IT IS

CERTAINLY REMINISCENT OF SOME OF THE TERRORISTS ACTIVITIES THAT HAVE GONE ON IN RECENT TIMES IN OTHER COUNTRIES.

SO I THINK THAT SAYING, WELL, HE ONLY PLANNED TO USE AN AK 47, HE DIDN'T PLAN TO USE A BOMB IS REALLY NOT ALL THAT SIGNIFICANT TO ME IN TERMS OF WHETHER HE COULD BE RELEASED OR NOT RELEASED. AND, IN FACT, HE DID READILY AGREE, ACCORDING TO THE COMPLAINT, THAT A BOMB WAS THE WAY TO GO.

AND SO, I DO BELIEVE THAT GIVEN HIS MENTAL CONDITION, HIS INSTABILITY, HIS WILLINGNESS TO BE USED, OR TO USE I SHOULD SAY WHATEVER WAS AVAILABLE TO CAUSE MASS DESTRUCTION IS CERTAINLY A DANGER TO THE COMMUNITY, AND ONE THAT I DON'T THINK COULD BE CONTROLLED BY CONDITIONS OF RELEASE.

SO I AM GOING TO HOLD HIM IN DETENTION BASED ON BOTH RISK OF FLIGHT AND DANGER TO THE COMMUNITY.

MR. ANTON, I WILL ASK THAT THE GOVERNMENT PREPARE A PROPOSED DRAFT DETENTION ORDER WITHIN ABOUT A WEEK.

MR. ANTON: YES, YOUR HONOR. THANK YOU.

THE COURT: OKAY. AND THIS IS SET FOR A PRELIMINARY HEARING OR ARRAIGNMENT ON MAY THE 16TH OF THIS YEAR.

IS THERE ANYTHING -- IS THERE ANYTHING FURTHER WITH RESPECT TO THIS CASE AT THIS TIME, MR. PADILLA?

MR. PADILLA: NO, JUDGE.

THE COURT: MR. ANTON, ANYTHING FURTHER?

MR. ANTON: NO, YOUR HONOR. THANK YOU.

THE COURT: OKAY. AND I ASSUME THE PARTIES WILL TAKE

APPROPRIATE STEPS REGARDING ANY TYPE OF MENTAL HEALTH EVALUATION THAT MAY BE NECESSARY OR PRUDENT WITH RESPECT TO COMPETENCY TO STAND TRIAL OR, YOU KNOW, COMPETENCY AT THE TIME OF THE OFFENSE, WHICHEVER MAY APPLY.

IS THAT CORRECT, MR. PADILLA?

MR. PADILLA: THAT'S CORRECT, JUDGE.

THE COURT: OKAY.

MR. PADILLA: THANK YOU.

THE COURT: AND, MR. ANTON, THE GOVERNMENT ALSO HAS A DUTY IN THAT REGARD.

MR. ANTON: YES, YOUR HONOR.

THE COURT: OKAY. THANK YOU.

- - -

C E R T I F I C A T E

UNITED STATES OF AMERICA

SOUTHERN DISTRICT OF FLORIDA

I, CARL SCHANZLEH, OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, DO HEREBY CERTIFY THAT THE FOREGOING 30 PAGES CONSTITUTE A TRUE TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE THE SAID COURT HELD IN THE CITY OF MIAMI, FLORIDA, IN THE MATTER THEREIN STATED.

IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS 31ST DAY OF MAY 2016.

/S/CARL SCHANZLEH
CARL SCHANZLEH, RPR-CM
CERTIFIED COURT REPORTER
9960 SW 4TH STREET
PLANTATION, FL 33324
TELEPHONE 954 424-6723